Bernice Barbour RAIFORD,
Plaintiff-Appellant,

v.

BUSLEASE, INC., Merrill Lynch, Pierce,
Fenner & Smith, Inc., and Thomas F.
Morris, Defendants-Appellees.

Morgan B. RAIFORD,
Plaintiff-Appellant,

v.

BUSLEASE, INC., Merrill Lynch, Pierce,
Fenner & Smith, Inc., and Thomas F.
Morris, Defendants-Appellees.

Nos. 86–8514, 86–8515.

United States Court of Appeals,
Eleventh Circuit.

Aug. 24, 1987.

James A. Parker, Atlanta, Ga., for plaintiff-appellant.

Paul W. Stivers, Rogers & Hardin, Atlanta, Ga., for defendants-appellees.

Before HILL and HATCHETT,
Circuit Judges, and HENDERSON,
Senior Circuit Judge.

HENDERSON, Senior Circuit Judge:

Dr. and Mrs. Morgan B. Raiford brought separate suits in the United States District Court for the Northern District of Georgia alleging, among other causes of action, that the defendants violated § 5 of the Securities Act of 1933, 15 U.S.C. § 77e, by selling securities for which a registration statement was not in effect. The plaintiffs sought rescission of their purchase and recovery of the consideration paid to the de-

fendants in accordance with § 12(1) of the Act, 15 U.S.C. § 77*l* (1). The district court, finding the plaintiffs' § 12(1) claims barred by the strict one-year limitation period of § 13 of the Act, 15 U.S.C. § 77m, granted the defendants' motions for partial summary judgment. We reverse.

The Raifords maintained separate securities accounts with the Atlanta office of Merrill Lynch, Pierce, Fenner & Smith, Inc. (Merrill Lynch). Thomas F. Morris, a vice president with Merrill Lynch, acted as the Raifords' account manager and advisor. In early 1981, Merrill Lynch became the placement agent for a program offered by Bus-Lease, Inc. known as the "Intercity Bus Management Program 81–1" (Program). Investors in the Program purchased forty-foot intercity buses from the manufacturer pursuant to arrangements made by Bus-Lease. Although the investors were the nominal owners of the buses, BusLease, under a Management Agreement, undertook to handle the leasing, maintenance and all other aspects of the ownership of the buses. The investors shared pro rata in the profits and liabilities of the bus fleet managed by BusLease. Because BusLease intended that the Program meet the requirements of the private placement exemption,[1] no registration statement was filed with the Securities Exchange Commission.

On Morris' recommendation, the Raifords decided to invest in the BusLease Program. On March 13, 1981, Dr. and Mrs. Raiford each executed four documents committing them to the BusLease deal, including (1) a Bus Purchase Contract, (2) a Management Agreement, (3) a Standby Management Agreement and (4) a Purchaser's Representations and Undertakings. There is a conflict in the testimony as to the method of financing the investment decided upon at this meeting. The Raifords contend that Morris assured them that the entire amount of the proposed investment would be borrowed from a financial institution without any cash outlay

from the Raifords. Morris claims that merely a portion of the investment was to be funded by loan proceeds.

Of the four subscription documents, only the Purchaser's Representations and Undertakings, designed to enable BusLease to judge the business acumen and sophistication of the Raifords as required by the private offering exception, mentions the financial arrangements for the transaction. One of the options available in that document, to be designated by check mark, is the payment in full of the subscription price from cash and marketable securities in the subscriber's account with Merrill Lynch. The Raifords' documents indicate that method of payment. It is undisputed that this section of the Purchaser's Representations and Undertakings was left blank when Dr. and Mrs. Raiford affixed their signatures. Although Morris admits filling in the other blanks on the document, he denies electing the provision stating that the purchase of the securities would be paid for by a deduction of $315,000.00 from each of the Raifords' securities accounts. The parties agree, however, that the Purchaser's Representations and Undertakings was completed while in the possession of Merrill Lynch.

Merrill Lynch forwarded the subscription documents to BusLease. BusLease accepted the Raifords as investors in the Program "as of May 20, 1981." Two-thirds of the investment price came from a loan provided by Chem Credit, the escrow agent for the Program, and the remainder from the Merrill Lynch securities accounts maintained by the Raifords. The transfer of funds and the transfer of title to the buses was accomplished on May 28, 1981.

On May 25, 1982, Dr. and Mrs. Raiford filed substantially identical complaints in federal district court. The cases were subsequently consolidated. The original complaints alleged violations of section 5 of the Securities Act, 15 U.S.C. § 77e, and sought rescission of the transaction and recovery

---

[1] Section 4 of the Securities Act of 1933, 15 U.S.C. § 77d provides in relevant part:
    The provisions of Section 5 shall not apply to—

    . . . .
    (2) transactions by an issuer not involving any public offering.

of the consideration paid pursuant to the provisions of section 12 of the Securities Act, 15 U.S.C. § 77*l*. Count Two complained of breach of fiduciary duty and fraud under Georgia law. The complaints were amended to add a third count stating a cause of action under section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5.[2] In June, 1985, the court granted the defendants' motion for partial summary judgment as to Count One of the complaint. The court ruled that the claims asserted under section 12(1) in Count One were barred by the one-year limitation period mandated by section 13 of the Securities Act. Finding that the date of contract constituted the sale triggering the running of the statute of limitations, the district court determined that such an agreement became binding on the parties on May 20, 1981 when BusLease accepted the subscription documents signed by the Raifords The court reasoned that BusLease could have maintained an action for breach of contract against the plaintiffs on that date and hence the rescission action brought by the plaintiffs on May 25, 1982 was barred by section 13.

On appeal, the Raifords do not dispute that the date of a valid contract constitutes a sale for the purposes of section 5. Rather, they contend that no such binding commitment was effective on May 20, 1981 because BusLease had actual and imputed knowledge through their agent Merrill Lynch that the subscription documents did not reflect the offer made to Morris, acting as dual agent in the transaction, because that offer was expressly conditioned upon securing a full bank loan for the purchase price. The defendants reply that if such an agreement between the Raifords and Morris did exist, the contract created by Bus-

Lease' acceptance of the subscription documents may be voidable for fraud, but nevertheless triggered the statute of limitations on the rescission action. For the reasons set forth below, the resolution of the contract issues raised by the parties is irrelevant to our decision in this case.

Section 12(1) of the Securities Act stipulates that any person who offers or sells an unregistered security in violation of section 5 of the Act shall be liable to the purchaser upon tender of the security, for the consideration paid plus interest, less the amount of any income received from the security. Section 13 of the Act, in part, provides: "No actions shall be maintained ... to enforce a liability created under [12(1)], unless brought within one year after the violation upon which it is based." Thus, the prohibition on selling unregistered securities is actually contained in § 5(a) of the 1933 Act. Section 12(1) merely provides a remedy for a violation of that section by authorizing recovery in a civil action against any person who offers or sells a security in contravention of section 5(a). The statute of limitations continued in section 13 begins running on the date of the act prohibited by section 5(a).

The violation alleged by the Raifords is covered by section 5(a)(1) which makes it unlawful for any person, unless a registration statement is in effect as to the security, "to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise...." The term "sell" is given only the most general definition in the Securities Act. Section 2(3) of the Act, 15 U.S.C. § 77b(3), merely states that "[t]he 'sale' or 'sell' of a

---

2. Early in the litigation the defendants moved to refer the state claims to arbitration as required by Customer Agreements signed by the plaintiffs and to stay the federal securities causes of action pending a resolution of the arbitration. The district court found that the state and federal claims were intertwined so as to make it impracticable to separate out non-arbitrable federal violations of the Securities Act of 1933 from arbitrable claims and therefore denied the defendants' motion. On appeal, we affirmed based on the continued viability of the inter-

twining doctrine in this circuit. *Raiford v. BusLease, Inc.,* 745 F.2d 1419 (11th Cir.1984). Soon after this decision, however, the Supreme Court rejected this doctrine, *Dean Witter Reynolds, Inc. v. Byrd,* 470 U.S. 213, 105 S.Ct. 1238, 84 L.Ed.2d 158 (1985) and the defendants renewed their motion. The district court stayed proceedings as to Counts II and III of the plaintiffs' complaints pending arbitration. The court's disposition of Count I forms the basis of this appeal.

security shall include every contract of sale or disposition of a security or interest in a security for value." Although the definition sheds a rather dim light on the meaning of "sell" in this context, it does at least indicate that the term, while including contracts of sale, may be interpreted more broadly.

The district court cited no authority in support of its conclusion that the date of contract was indeed the date of the sale which purportedly infringed on section 5. We glean from the pleadings and briefs in this case, however, that the court followed the "commitment doctrine" approach developed by the Second Circuit Court of Appeals in *Radiation Dynamics, Inc. v. Goldmuntz*, 464 F.2d 876, 890 (2d Cir. 1972). Although this doctrine was formulated to determine when the sale of a security takes place for purposes of a Rule 10b–5 action, a number of district courts have engrafted its precepts onto a cause of action brought pursuant to section 12(1). *See e.g., Eriksson v. Galvin*, 484 F.Supp. 1108, 1119 (S.D.N.Y.1980); *Rochambeau v. Brent Exploration, Inc.*, 79 F.R.D. 381, 384 (D.Colo.1978). Under this view, the relevant date of the sale of a security is the time when the parties enter into an agreement evincing a commitment to the transaction, not when the securities or the purchase price actually change hands. *Radiation Dynamics*, 464 F.2d at 890.

An analysis of the underlying rationale of the commitment doctrine leads to the conclusion that while it may effectuate the goals of the securities laws in the context of Rule 10b–5, the application of its restrictive interpretation of "sale" to an action based on section 5 of the 1933 Act frustrates the broad remedial purpose of the Act. As explained in *Radiation Dynamics*, the thrust of Rule 10b–5 is that an insider who has material inside information or a person who has obtained such information from an insider may not use that information in connection with the purchase or sale of securities to take advantage of his knowledge at the expense of the person with whom the insider is dealing. *Id.* at 888. The duty to disclose or refrain from dealing based on material inside informa-

tion, however, persists only until the date of commitment to a securities transaction. This is so because "[a] party does not, within the intendment of Rule 10b–5, use material inside information unfairly when he fulfills contractual commitments which were incurred by him previous to his acquisition of that information." *Id.* at 890. The Rule 10b–5 goal of fundamental fairness in the securities marketplace is preserved by use of the time of commitment for fixing the date of sale. *Id.*

■ Section 12(1), by contrast, imposes what amounts to strict liability for a violation of section 5 through the use of the mails or interstate commerce to sell an unregistered security. Comment, "Reasonable Care" in section 12(2), 48 U.Chi.L.Rev. 372, 377 (1981). To establish a prima facie case of violation of section 5, a plaintiff need allege only the sale or offer to sell securities, the absence of a registration statement covering the securities, and the use of the mails or facilities of interstate commerce in connection with the sale or offer. *Swenson v. Engelstad*, 626 F.2d 421, 424–25 (5th Cir.1980). Section 12(1) will allow a purchaser to recover his investment "regardless of whether he can show any degree of fault, negligent or intentional, on the seller's part." *Id. quoting, Hill York Corp. v. American International Franchises, Inc.*, 448 F.2d 680, 686 (5th Cir.1971). Therefore, the rationale supporting the district court's implicit holding that the use of interstate commerce to complete the sale of the security after the date of contract did not violate the Act, disappears. In fact, the restrictive interpretation of "sell" utilized by the court in this case may hinder an important purpose of the Act. By enacting section 12(1), "Congress sought to encourage sellers of securities to register those securities prior to any sales or offer to sell." *Henderson v. Hayden, Stone Inc.*, 461 F.2d 1069, 1072 (5th Cir.1972). Allowing recovery for sales activity after the date of contract effectuates this legislative goal.

■ The Securities Act of 1933 must be interpreted broadly by the courts in order

to effectuate the congressional intent to protect investors. *Securities and Exchange Commission v. Carriba Air, Inc.,* 681 F.2d 1318, 1324 (11th Cir.1982); *Herpich v. Wallace,* 430 F.2d 792, 806–07 (5th Cir.1970). Furthermore, the terms "sell" and "sale" as used in section 5 are intended to be used in a broad sense. *Roe v. United States,* 316 F.2d 617, 620 (5th Cir.1963). Consequently, we construe section 5(a)(1) of the Act to prohibit the use of the mail or interstate commerce to complete any integral stage of the sale of an unregistered security, including remittance of the funds for the purchase. *See McDaniel v. United States,* 343 F.2d 785, 786–87 (5th Cir.) (violation of section 5(a) in mailing of confirmation of sale) *cert. denied,* 382 U.S. 826, 86 S.Ct. 59, 15 L.Ed.2d 71 (1965); *United States v. Pollack,* 534 F.2d 964, 972 n. 6 (D.C.Cir.) (use of mails to transmit proceeds or confirmation of sale of unregistered securities violates section 5(a)(1)), *cert. denied,* 429 U.S. 924, 97 S.Ct. 324, 50 L.Ed.2d 292 (1976); *United States v. Wolfson,* 405 F.2d 779, 783–84 (2d Cir.1968), (section 5(a)(1) violated when mails used to remit proceeds of sale of unregistered securities to seller), *cert. denied,* 394 U.S. 946, 89 S.Ct. 1275, 22 L.Ed.2d 479 (1969).

On May 28, 1981, the defendants made use of instruments of interstate commerce to transfer the purchase price of the securities from the escrow account with Chem Credit and from the Raifords' securities accounts. This event constituted an integral part of the sale of an unregistered security and therefore violated section 5(a)(1) of the Securities Act of 1933. The plaintiffs filed their complaint on May 25, 1982, within one year of that date. *See Hamilton Bank & Trust Co. v. Holliday,* 469 F.Supp. 1229, 1237 (N.D.Ga.1979) (one year period of section 13 begins on date of last pertinent activity alleged to violate Act). We therefore reverse the finding of the district court that the Raifords' rescission claims are barred by the statute of limitations set forth in section 13 of the Act. While the plaintiffs' causes of action have been preserved by our application of the "most lenient standard" in deciding the statute of limitations issue, *Doran v. Pe-*

*troleum Management Corp.,* 576 F.2d 91, 93 (5th Cir.1978), there remains for resolution in the district court the question of whether the transaction was in fact exempt from the registration requirements of the Securities Act.

REVERSED and REMANDED.